The court incorporates by reference in this paragraph and adopts as the findings and analysis of this court the document set forth below. This document has been entered electronically in the record of the United States Bankruptcy Court for the Northern District of Ohio.



Dated: September 22 2014

Mary Ann Whipple
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| In Re: | ) | Case No.: 13-31450 |
| | ) | |
| Jesse Lee Crowe, | ) | Chapter 7 |
| | ) | |
|        Debtor. | ) | Adv. Pro. No. 13-3092 |
| | ) | |
| Jeffrey Fortman, et al, | ) | Hon. Mary Ann Whipple |
| | ) | |
|        Plaintiffs, | ) | |
| v. | ) | |
| | ) | |
| Jesse Lee Crowe, | ) | |
| | ) | |
|        Defendant. | ) | |
| | ) | |

**MEMORANDUM OF DECISION**

    This adversary proceeding is before the court for decision after trial on Plaintiffs' complaint to determine dischargeability of a debt allegedly owed to them by Defendant, the debtor in the underlying Chapter 7 case. Plaintiffs allege that the debt should be excepted from discharge under 11 U.S.C. § 523(a)(2)(A) and (a)(4). Defendant alleges a counterclaim for attorney fees under 11 U.S.C. § 523(d).

    The district court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §1334(b) as a civil proceeding arising in or related to a case under Title 11. This proceeding has been referred to this court by the district court under its general order of reference. 28 U.S.C. § 157(a); General Order 2012-7 of the United States District Court for the Northern District of Ohio. Proceedings to determine

dischargeability of debts are core proceedings that the court may hear and decide. 28 U.S.C. § 157(b)(1) and (b)(2)(I).

At trial, the court granted Defendant's motion requesting judgment on partial findings pursuant to Rule 52(c) of the Federal Rules of Civil Procedure, made applicable in this proceeding by Federal Rule of Bankruptcy Procedure 7052. For the reasons stated on the record at the conclusion of Plaintiffs' case and after Plaintiffs were fully heard on the issues, the court rendered judgment in favor of Defendant and against Plaintiffs as to their claim brought under § 523(a)(4) and in favor of Defendant and against Plaintiff Jeffrey Fortman as to his claim brought under § 523(a)(2)(A).

This Memorandum of Decision addresses the remaining claim of Plaintiff Nancy Fortman ("Plaintiff") brought under § 523(a)(2)(A) and Defendant's counterclaim for attorney fees, and constitutes the court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a). Regardless of whether specifically referred to in this Memorandum of Decision, the court has examined the submitted materials, weighed the credibility of witnesses, considered all of the evidence, and reviewed the entire record of the case. Based upon that review, and for the reasons discussed below, the court finds that Defendant is entitled to judgment in his favor on Plaintiff's § 523(a)(2)(A) claim and that Plaintiffs are entitled to judgment on Defendant's counterclaim for attorney fees.

## **FINDINGS OF FACT**

This proceeding involves a series of contracts for new construction and improvements that were to be completed by Defendant at Plaintiffs' home (collectively, "the Project"). Plaintiff Nancy Fortman ("Plaintiff") has a masters of education degree and has taught for thirty-five years. She has no construction experience.

Defendant dropped out of high school and later obtained his General Educational Development diploma. After leaving school, Defendant's work experience included working at two fast food restaurants before being employed at Sheritt Home Renovation company, where he gained his first experience in the construction industry. Although the record is silent as to how long he worked for the renovation company, Defendant testified that he worked two days per week as the "right-hand man" on a two-man team. His work included "a lot of roofing," some framing of new construction, and one small addition. Defendant's flooring experience consisted of tiling floors in his home. After working for the renovation company and before going into business as Crowe's Contracting, Defendant worked in retail sales at an automotive store and in industry unrelated to the construction industry. At the time of entering into the contracts with Plaintiff, Defendant was twenty-five years old and had been doing business as Crowe's Contracting for two

or three years.

Plaintiff approached Defendant, who lives next door to her, after seeing the logo for Crowe's Contracting on his van. At Plaintiff's first meeting with Defendant in May 2009, she explained the Project, which included a new roof and gutters, remodeling a second-floor bathroom, remodeling the basement and kitchen, building a garage and an addition to the first floor and basement. Plaintiff testified that Defendant was enthusiastic and, when she told him that she wanted the Project completed by May 2010, he told her "no problem" and "I can do this."

Before hiring Defendant to do the work in and at her home, she reviewed a business card for Crowe's Contracting given to her by Defendant and an internet site, merchantcircle.com. The business card states that Defendant is the "Owner/Carpenter" and describes his work as "[c]ustom carpentry, remodeling, additions, and straw bale construction." [Pl. Ex. 1]. Merchantcircle.com describes Crowe's Contracting as an "[i]nsured general contractor" and states that it "[s]pecializ[es] in additions and remodeling and everything in between. Including windows, doors, siding, drywall and painting. All your residential carpentry needs." [Pl. Ex. 2]. According to Plaintiff, but for representations on Defendant's business card and the internet site, and his statement that he could do the job, she would not have hired him.

Defendant met with Plaintiff and walked through her house several times before preparing the proposals and change work orders for the work to be done that were accepted and signed by Plaintiff and constitute the contracts between the parties.[1] The following is a brief summary of those contracts and change work orders relating to those contracts:

1. Upstairs bathroom remodeling contract dated May 24, 2009, for $5,090, with $4,000 due at start of job and the balance on completion ("Upstairs Bathroom Contract"). [Pl. Ex. 3, p. 2-3].

1(a). Change Work Order regarding the Upstairs Bathroom Contract for an additional $2,050, [*id.* at 1], and replacing electrical in that room for an additional $250, [*id.* at 39].

2. Basement remodeling contract, including remodeling existing basement, installing cabinets from original first floor kitchen and installing a bathroom in a basement addition, dated June 3, 2009, for $11,720, with $9,000 due at start of job and the balance on completion ("Basement Remodeling Contract"). [*Id.* at 4-5].

2(a). Change Work Order signed on July 27, 2009, requiring Defendant to purchase formica counter top for basement kitchen for an additional $700. [*Id.* at 6].

---

[1] Plaintiff has acknowledged signing all of the contracts and change work orders, although the copies in evidence do not all include her signature.

3

2(b). Change Work Order signed on July 27, 2009, requiring electrical work in basement, including new breaker box and wiring for basement kitchen to be completed for an additional $1,725. [*Id.* at 7].

2(c). Change Work Order signed on July 27, 2009, requiring Defendant to purchase and install a flat screen television for an additional $1,000. [*Id.* at 8].

3. Change Work Order signed on July 27, 2009, requiring property to be surveyed for an additional $500. [*Id.* at 9].

4. Contract to roof house and addition dated July 27, 2009, for $6,100, with $4,000 due at start of job and the balance on completion ("Roofing Contract"). [*Id.* at 10-11].

5. Contract to build a ten foot by thirty foot addition with a basement, including all rough electrical, plumbing and heating, ventilation and air conditioning ("HVAC") work, signed on August 21, 2009, for $27,500, with $20,000 due at start of job and the balance on completion ("House Addition Contract"). [*Id.* at 12-14].

6. Contract to complete first floor bathroom in addition dated August 10, 2009, for $7,050, with $5,000 due at start of job and the balance on completion ("First Floor Bathroom Contract"). [*Id.* at 15-17].

7. Contract dated August 10, 2009, to demolish original first floor bathroom and remodel original kitchen area, with custom built cupboards, for $14,000, with $8,000 due at start of job and the balance on completion ("Kitchen Contract"). [*Id.* at 18-20]. The Kitchen Contract specifies that the sink, appliances, lighting, counter top, faucet, and garbage disposal would be provided by Plaintiff. [*Id.* at 18].

8. Contract to insulate attic and exterior walls of house dated August 10, 2009, for $2,800, with $1,400 due at start of job and the balance on completion. [*Id.* at 22-23].

9. Contract to paint exterior of house dated August 10, 2009, for $3,550, with $2,000 due at start of job and the balance on completion ("Exterior Painting Contract"). [*Id.* at 24-25].

10. Contract to replace gutters and downspouts on house dated August 10, 2009, for $1,790, with $1,000 due at start of job and the balance on completion ("Gutter and Downspout Contract"). [*Id.* at 26-27].

11. Contract to build a garage dated April 12, 2010, for $21,500, with $19,000 due at start of job and the balance on completion ("Garage Contract"). [*Id.* at 40-41]. This contract replaced an earlier contract signed on August 21, 2009. [*Id.* at 28-31].

12. Contract to build a corner cabinet and island for the kitchen signed on July 7, 2011 ("Kitchen Island Contract"). [*Id.* at 32-38].

All of the foregoing contracts state that "work is to be completed in a substantial and workmanlike manner."

4

Defendant testified that his love is carpentry. There is no question that Defendant lacked much experience in several other skill sets that would be required in completing the contracts and was admittedly not competent to complete or inspect the electrical, plumbing and HVAC work that was required under the contracts. Nevertheless, he testified that he believed that he could either figure out what he needed to do or hire subcontractors to do what he was not capable of doing. Defendant did in fact hire subcontractors to complete necessary concrete work, as well as to do electrical and plumbing work. Defendant testified that he believed the subcontractors hired by him were licensed to do the required work and assumed it was done correctly. Although Defendant testified that he also planned on hiring a subcontractor to do the HVAC work, he had run out of money by the time that work was to be done and did it himself.

Defendant began work under the Upstairs Bathroom Contract in early June 2009 and substantially completed the contract by the end of August 2009. Shortly after beginning that contract, the parties entered into the Basement Remodeling Contract. Except for the Garage Contract dated April 12, 2010, and the Kitchen Island Contract that was not entered into until July 7, 2011, all of the remaining contracts were entered into within a few weeks of completion of the Upstairs Bathroom Contract, with both the House Addition Contract and the original Garage Contract being entered into as late as August 21, 2009. Defendant credibly testified that Plaintiff's satisfaction with his work on the upstairs bathroom occasioned the execution of later contracts.

The amount that was to be paid to Defendant under all of the contracts totals $107,325. Plaintiff paid Defendant $4,000 on May 26, 2009, as the down payment under the Upstairs Bathroom Contract, and $9,000 on June 3, 2009, as the down payment under the Basement Remodeling Contract. [Pl. Ex. pp. 1-4]. On July 27, 2009, Plaintiff paid Defendant $11,315 which included final payment under the Upstairs Bathroom Contract, as well as payments under the Change Work Orders set forth above at numbers 1(a), 2(a), 2(b), 2(c), 3, and the down payment under the Roofing Contract set forth above at number 4. [*See id.* at 5-6]. On August 21, 2009, Plaintiff paid Defendant $39,000 as the down payment under the House Addition Contract and the original Garage Contract, as set forth above at numbers 5 and 11. [*See id.* at 7-8]. The final payment under the contracts that was made by Plaintiff was made on April 14, 2010, in the amount of $25,000 at Defendant's request in order to complete the Project by May 10, 2010, as had been requested by Plaintiff. Although the record is silent as to which contracts that payment was allocated, the court notes that as of April 14, 2010, down payments on the First Floor Bathroom Contract, Kitchen Contract, Insulation Contract, Exterior Painting Contract, and Gutter and Downspout Contract, which total $17,400, had not yet been paid. Payments made by Plaintiff under the contracts total $88,315. In addition,

5

Plaintiff paid Defendant $10,000 on September 29, 2009, which covered the cost of dealing with a problem that arose relating to a neighbor's gas lines that ran through Plaintiff's yard.

Defendant was not able to complete the Project by May 2010. Defendant testified that he "had trouble making things come together as fast as he thought they should." Plaintiff testified that Defendant came to work at her house most days until December 2009 and then his work at her home became sporadic. Defendant explained that he also spent time in his shop on carpentry work related to the custom cabinets and corbels. He testified that the contract did not specify a cabinet style and that he spent time constructing different cabinet designs. Because she was concerned that Defendant was behind schedule, in September 2010, Plaintiff contacted general contractor Rick Lynn to evaluate the percentage of work completed under the contracts. Lynn testified that Defendant's contractual obligations were 60 to 65 percent complete at that time and that he advised Plaintiff to get as much done by Defendant as she could.

In January 2012, Plaintiff again asked Lynn to evaluate Defendant's work at her home. At that time, Lynn recommended that Plaintiff stop any further work by Defendant as he believed more harm than good was being done by then. On January 10, 2012, after Defendant and his father-in-law had spent the day laying tile in the first floor addition, Plaintiff terminated Defendant's work in her home.

Lynn testified at trial as an expert general contractor. With respect to the contracts at issue, Lynn testified that all of the following were substantially completed by Defendant before his termination: the Upstairs Bathroom Contract, Roofing Contract, Insulation Contract, Exterior Painting Contract, Gutter and Downspout Contract, and the Garage Contract. Plaintiff testified that the Change Work Order requiring a survey of her property was completed, and Lynn testified that work under all of the remaining Change Work Orders was substantially completed.

Work remaining unfinished and/or deficient under the contracts primarily relates to the kitchen and interior work in the addition. Lynn testified that major work remained under the First Floor Bathroom Contract and that the House Addition Contract was approximately seventy percent completed. According to Lynn, mechanical issues relating to the addition that a competent general contractor would not allow were his primary reason for recommending termination of Defendant's work. He testified that the HVAC system was noticeably insufficient in that only one air line from the furnace had been installed to service the addition, the plumbing lines were not vented in the downstairs bathroom, which is necessary for the plumbing to operate properly, and the custon-built windows in the addition had to be removed and replaced as they had no weather stripping and had been leaking for a fair amount of time. Lynn also testified that the floor level of the addition was lower than the adjacent room in the existing house, an issue that was due

6

to a calculation error in building the addition that should have been corrected. Residue on tile installed in the basement bathroom was not cleaned and tile laid on the first floor addition was misaligned with the tile lines in the area next to it.

Lynn testified that Defendant had significantly underbid the Addition Contract. According to Lynn, a standard amount for an addition such as Plaintiff's addition is approximately $45,000, while Defendant contracted to complete the addition for only $27,500. Likewise, Lynn testified that the Kitchen Contract was grossly underbid at only $14,000. Lynn's estimate to finish the kitchen cabinets, which were unfinished as Plaintiff had not yet decided on a cabinet door design, is alone $14,803. [Pl. Ex. 10, p. 2]. According to Lynn, except for the floor elevation issue in the addition, Defendant's earlier work was done in a workman-like manner but problems arose later, "either because he was not competent or because he was trying to cut costs."

Lynn further testified that Defendant's contracts lacked the specificity typically seen in construction and renovation contracts such as these. According to Plaintiff, the lack of specificity resulted in "a lot of discussion" as to what she wanted. For example, the Upstairs Bathroom Contract did not specify the type of faucet to be installed. Thus, she testified that she chose a $250 faucet that Defendant purchased and installed for her since she had told him she "wanted quality." The lack of specificity of the Kitchen Contract, which did not specify a design for the cabinets to be installed, resulted in Defendant constructing multiple cabinet designs for Plaintiff's approval, including one Plaintiff had originally indicated that she liked, none of which, however, she had yet agreed upon at the time she terminated any further work by Defendant. Defendant testified that he would nevertheless have tried to finalize a design with Plaintiff as he wanted her to be happy with his work when he finished.

Lynn provided an estimate of $73,180.51 to repair and complete construction work at Plaintiff's home. However, he testified that the estimate includes items not included in the contracts between Plaintiff and Defendant as well as items required to complete the contracts.

## LAW AND ANALYSIS

### I. 11 U.S.C. § 523(a)(2)(A)

Plaintiff seeks a determination that a debt owed to her by Defendant in connection with the construction and renovation work at her home is nondischargeable under 11 U.S.C. § 523(a)(2)(A). Exceptions to discharge are to be strictly construed against the creditor and liberally in favor of the debtor. *Rembert v. AT&T Universal Card Servs. (In re Rembert),* 141 F.3d 277, 281 (6th Cir. 1998).

Section 523(a)(2)(A) excepts from discharge a debt " for money, property, [or] services,. . . to the

7

extent obtained by – (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition. . . ." In order to except a debt from discharge under this section due to false pretense or false representation, a plaintiff must prove the following elements by a preponderance of the evidence: (1) the debtor obtained money, property, services or credit through a material misrepresentation, either express or implied, that, at the time, the debtor knew was false or made with gross recklessness as to its truth; (2) the debtor intended to deceive the creditor; (3) the creditor justifiably relied on the false representation; and (4) the creditor's reliance was the proximate cause of loss. *Rembert,* 141 F.3d at 280-81.

For purposes of § 523(a)(2)(A), "false representations and false pretenses encompass statements that falsely purport to depict current or past facts." *Peoples Sec. Fin. Co., Inc. v. Todd (In re Todd)*, 34 B.R. 633, 635 (Bankr. W.D. Ky. 1983). "'False pretense' involves implied misrepresentation or conduct intended to create and foster a false impression, as distinguished from a 'false representation' which is an express misrepresentation." *Ozburn v. Moore (In re Moore)*, 277 B.R. 141, 148 (Bankr. M.D. Ga. 2002)(quoting *Sears Roebuck & Co. v. Faulk (In re Faulk)*, 69 B.R. 743, 750 (Bankr. N.D. Ind. 1986)).

A debtor's intent to defraud a creditor is measured by a subjective standard and must be ascertained by the totality of the circumstances of the case at hand. *Rembert,* 141 F.3d at 281-82. A finding of fraudulent intent may be made on the basis of circumstantial evidence or from the debtor's "course of conduct," as direct proof of intent will rarely be available. *Hamo v. Wilson (In re Hamo),* 233 B.R. 718, 724 (B.A.P. 6th Cir. 1999). However, "if there is room for an inference of honest intent, the question of nondischargeability must be resolved in favor of the debtor." *ITT Final Servs. v. Szczepanski (In re Szczepanski),* 139 B.R. 842, 844 (Bankr. N.D. Ohio 1991).

With respect to her false representation or actual fraud claim under § 523(a)(2)(A), Plaintiff has not proven the first three elements under *Rembert* – that Defendant knowingly, or with gross recklessness as to the truth, made a materially false representation with the intent to deceive Plaintiff. Plaintiff argues that Defendant made false representations regarding his ability to complete the Project. According to Plaintiff, representations on Defendant's business card, the internet site merchantcircle.com, and his oral representation that he could do the job, as well as representations in the contracts that the work would be completed in a "substantial and workmanlike manner," form the basis of her § 523(a)(2)(A) claim.

Defendant's business card simply states the name of his business, that he is the owner and carpenter and describes the nature of the business as "[c]ustom carpentry, remodeling, additions, and straw bale construction," all of which is true. [Plff. Ex. 1]. Defendant is the owner and sole proprietor of Crowe's

Contracting, is a carpenter, and was engaged in the business described on his business card. There is no representation regarding his qualifications, experience or otherwise. Defendant's business card does not contain a false representation.

With respect to the internet site, the record is silent as to who was responsible for the representations set forth at that site. Even assuming the representations are attributable to Defendant, Plaintiff has not shown that they are false. The internet site represents that Crowe's Contracting is an "[i]nsured general contractor." Defendant had been operating Crowe's Contracting for two or three years at the time he contracted with Plaintiff. According to Lynn, there is no licensing required in Ohio to be a general contractor. And the record is silent as to whether or not Defendant was insured. The only other representation on that site is that Crowe's Contracting "[s]pecializes in additions and remodeling and everything in between. Including windows, doors, siding, drywall and painting. All your residential carpentry needs." [Pl. Ex. 2]. This statement again simply describes the nature of the business in which Defendant was in fact engaged and does not rise to the level of a fraudulent representation.

Defendant's oral statements "no problem" and "I can do this" after Plaintiff explained the Project that she wanted completed are also a basis of her § 523(a)(2)(A) claim. Defendant did in fact run into problems and could not complete the Project in the workmanlike manner anticipated by the parties – the addition floor was not level with the existing adjacent room, the addition windows were leaking, some of the plumbing was installed improperly and the HVAC system was insufficient. However, the court does not believe Defendant's statements were, at the time made, knowingly false or made with gross recklessness as to their truth.

"'Knowing' means 'having or showing awareness or understanding' and includes conscious or deliberate acts." *Haney v. Copeland (In re Copeland)*, 291 B.R. 740, 763 (Bankr. E.D. Tenn. 2003). "Gross recklessness" is not defined in the Bankruptcy Code and, as one court noted, the term appears to be a term of art with only minimal use outside the bankruptcy arena. *First Nat'l Bank of Centerville v. Sansom, (In re Sansom)*, 224 B.R. 49, 57 n. 11 (Bankr. M.D. Tenn. 1998). Although the Sixth Circuit has not specifically defined "gross recklessness," courts have held that a debtor must have made the representation with reckless disregard for, or conscious indifference to, the truth. *See Copeland*, 291 B.R. at 763; *Nat'l City Bank v. Manning (In re Manning)*, 280 B.R. 171, 191 (Bankr. S.D. Ohio 2002); *Pearce v. Muncey (In re Muncey)*, No. 08-51850, 2009 WL 1651451, *5, 2009 Bankr. LEXIS 1466, *14 (Bankr. E.D. Tenn. June 12, 2009).

Recently, the United States Supreme Court addressed the state of mind requirement for § 523(a)(4)'s exception to discharge for defalcation while acting in a fiduciary capacity. *Bullock v. BankChampaign,*

9

*N.A.*, 133 S.Ct. 1754 (2013). The Court held that "defalcation" includes a culpable state of mind requirement similar to the fraud exception to dischargeability. *Id.* at 1757, 1759. The Court described that state of mind as "one involving knowledge of, or gross recklessness in respect to, the improper nature of the relevant fiduciary behavior." *Id.* at 1759. The Court explained gross recklessness to be reckless conduct of the kind set forth in the Model Penal Code so that "[w]here actual knowledge of wrongdoing is lacking, we consider conduct as equivalent if the fiduciary 'consciously disregards' (or is willfully blind to) 'a substantial and unjustifiable risk' that his conduct will turn out to violate a fiduciary duty." *Id.*

In this case, notwithstanding his lack of experience in tackling a project of the magnitude of Plaintiff's renovation and construction Project, the court credits Defendant's testimony that he believed that he would be able to either figure out what he needed to do or hire subcontractors to do what he was not capable of doing. He in fact substantially completed in a workmanlike manner the Upstairs Bathroom Contract, Roofing Contract, Insulation Contract, Exterior Painting Contract, Gutter and Downspout Contract, and the Garage Contract. According to Plaintiff's expert, Defendant's early work, including, with the exception of the floor elevation issue, his early work on the addition, was done in a workmanlike manner. The unfinished and/or deficient work relates primarily to the Kitchen Contract and interior work in the addition.

As to the Kitchen Contract, although not completed, Plaintiff had not yet even chosen a kitchen cabinet door design at the time she terminated Defendant's work. And there is no evidence of deficiencies in his work under the Kitchen Contract that would support a finding of gross recklessness as to the truth of his statement, "I can do this."

Deficiencies in Defendant's work lie primarily in work on the interior of the addition due to deficient work completed by a subcontractor hired by Defendant to do the required plumbing and deficient work on the HVAC system by Defendant when he was unable to hire an HVAC subcontractor because he had underbid the contracts and had run out of money. Although Lynn testified that a competent general contractor in the construction industry should be able to inspect the work of his subcontractors and would not allow such deficiencies to exist, the record is silent as to Defendant's understanding of these duties. The court credits Defendant's testimony that he believed the subcontractors hired by him were licensed to do the required work and trusted that it was done properly.

Given Defendant's honest belief at the time of contracting that he could, with the help of subcontractors, complete the Project, and notwithstanding later events, including deficient performance by a subcontractor and running out of money to hire work done that he was not competent to do, the court does not find his statements were knowingly false when made. Nor does the court find Defendant's

10

representation that he could do the job rise to the level of gross recklessness as to its truth. Although his prior work experience was not extensive, it did include completing or helping to complete a small addition, remodeling bathrooms, roofing, and some tiling, such that he believed he could figure out what he needed to do or hire subcontractors to do what he was unable to do. Defendant's work experience, albeit not extensive, and his subsequent successful performance of much of the work, as well as issues arising much later due to the fact that he had underbid the Kitchen Contract and House Addition Contract, lead the court to conclude that Defendant did not consciously disregard a substantial and unjustifiable risk known to him regarding his ability to complete the Project.

The court finds that the facts in *Vinson v. Cozart (In re Cozart)*, 417 B.R. 116 (Bankr. W.D. Ark. 2009), cited by Plaintiff in support of her argument that Defendant made false representations regarding his ability to complete the Project, are distinguishable. In *Cozart,* the debtor had represented himself as a home builder to the plaintiffs, potential buyers of a partially completed home. In extended conversations with the plaintiffs, Cozart represented that he was a "great builder" with "a lot of experience," had built many local structures and other homes, hired the best contractors and subcontractors and "doesn't spare money." *Id.* at 120-21. However, Cozart's experience did not include participating in construction in any "hands-on" manner and was limited to hiring subcontractors. *Id.* at 126. Plaintiffs ultimately purchased the home and experienced several major problems, including water "leaking like a shower head" from a light in the family room during a rainstorm, a drooping ceiling, leaking windows, no insulation in a ceiling, no flashing on the roof, buckled and moldy floors, ceiling joists that were uneven because the "upstairs was too heavy for the downstairs." *Id.* at 122-23. The court found that these deficiencies were inconsistent with Cozart's representations regarding quality and, based upon his experience, the court found that Cozart displayed a reckless disregard for the truth. *Id.* at 126-26.

In this case, unlike the express representations in *Cozart* regarding the quality of work that could be expected, Defendant made no representations regarding his expertise or experience in the construction industry. He simply stated that he could do the job. As discussed above, his statement does not rise to the level of a misrepresentation knowingly made or made with gross recklessness for the truth.

Plaintiff also asserts that Defendant's failure to complete certain work in a "substantial and workmanlike manner" as provided for in each contract is a further basis of her § 523(a)(2)(A) claim. Plaintiff has proven a breach of contract with respect to the deficiencies in the work on the interior of the House Addition contract. While a mere breach of a contract will not support a finding of fraud, "any debtor who does not intend to perform a contract from its inception has knowingly made a false representation." *Stifter v. Orsine (In re Orsine),* 254 B.R. 184, 188 (Bankr. N.D. Ohio 2000). However, for all of the reasons

11

discussed above, the court does not believe that, at the time Defendant entered into the contracts, he did not intend to complete them in a substantial and workmanlike manner. He continued working through January 2012 until Plaintiff terminated his services. And while there were clearly performance deficiencies as Lynn pointed out, Defendant did complete much of the work in a workmanlike manner, to the point that after Plaintiff's first consultation with Lynn in September 2010 he recommended that she keep Defendant working on the Project "to get as much done as they could as long as he would come back." In September 2010, Lynn characterized the Project as 60-65% complete. The court cannot find from the evidence that Debtor either did not intend to perform the Project at all, or did not intend to perform it to the standard or timing agreed upon, at the times the contract documents were signed.

Even if the business card, the internet cite and Defendant's statements constitute false representations made by Defendant with the requisite culpability, the court cannot find reliance, let alone justifiable reliance by Plaintiff as a causal element of damages. Instead of Plaintiff's reliance on any business card, internet site or even his statements that "I can do that," the court finds that the most important element in Plaintiff hiring Defendant to do the more substantial aspects of the Project, specifically the house Addition Contract, the First Floor Bathroom Contract, the Kitchen Contract, the Basement Remodeling Contract and the Garage Contract, was Defendant's workmanlike performance (according to Lynn just typical "punch list" items remained) on the on the Upstairs Bathroom Contract, which was substantially complete in the July and August 2009 time frame. On this point, the parties' testimony agrees. Defendant testified that Plaintiff "was very happy with the [upstairs] bathroom" and that occasioned other contracts with her. Likewise Plaintiff answered "correct" when asked at trial whether if Defendant had not done the work on the bathroom she would not have hired him do the work on the other contracts. Another blow to a finding of reliance in the court's view is that Plaintiff signed additional contract documents in July 2011, some two years after the original contracts were for the most part signed and even after she had already consulted a lawyer and Lynn about the Project problems. [Plff. Ex. 3, pp. 32-38]. Just as she had in 2009, Plaintiff was relying on Defendant's performance in moving forward.

The court has also considered whether Plaintiff has proven a broader case of false pretenses against Defendant under § 523(a)(2)(A) beyond any specific false representation. Added to the analysis on this point along with the other circumstances discussed above is Defendant's "gross" underbidding of the Garage and Kitchen and Contracts. Lynn was credibly adamant that Defendant has substantially underbid them and the Project overall was underbudgeted by 50-75%. The underbidding had an impact on the ultimate breach, as Defendant admits that he ran out of money and started doing plumbing and HVAC that he was not competent to do because he could not afford to hire it out as intended. Nevertheless, the court finds that the

12

requisite level of culpable level of intent is missing from the evidence. This is not a case where the evidence shows a contractor underbid a project to entice a customer to get cash and then run or to apply it to other projects or to pay unrelated expenses. Rather, Defendant performed substantial amounts of the Project and kept working at it until he was terminated in January 2012. He hired other contractors and paid them, as there are no mechanics liens on the property. Instead of being part of a larger pattern of conduct designed to foster a false impression in Plaintiff, the underbidding and other performance deficiencies were the product of Defendant's misjudgment and inexperience. The bottom line is that the court believed Defendant when he testified that "I believed I could complete the job and do it the way they wanted it done."

Plaintiff having failed to prove a misrepresentation by Defendant that he knew was false or that was made with gross recklessness as to its truth upon which Plaintiff relied or false pretenses and, thus, having failed to satisfy her burden under § 523(a)(2)(A), Defendant is entitled to judgment in his favor on that claim.

## II. 11 U.S.C. § 523(d)

Defendant asserts a counterclaim, alleging that he is entitled to an award of costs and attorney fees pursuant to § 523(d). Generally, under the "American Rule," which applies to litigation in the bankruptcy courts, a prevailing litigant may not collect attorney fees from his opponent unless authorized by federal statute or an enforceable contract between the parties. *In re Sheridan*, 105 F.3d 1164, 1166 (7th Cir. 1997). Section 523(d) provides such statutory authorization in a dischargeability proceeding, as follows:

> If a creditor requests a determination of dischargeability of a consumer debt under subsection (a)(2) of this section, and such debt is discharged, the court shall grant judgment in favor of the debtor for the costs of, and a reasonable attorney's fee for, the proceeding if the court finds that the position of the creditor was not substantially justified, except that the court shall not award such costs and fees if special circumstances would make the award unjust.

11 U.S.C. § 523(d).

Plaintiffs have requested a determination that Defendant owes them a debt that is nondischargeable under § 523(a)(2), and the court has determined that such debt is dischargeable. However, § 523(d) applies only to *consumer debts* under § 523(a)(2). "Consumer debt" is defined as a "debt incurred by an individual primarily for a personal, family or household purpose." 11 U.S.C. § 101(8). And "debt" is defined as "liability on a claim." 11 U.S.C. § 101(12). In this proceeding, the debt at issue is Defendant's liability on Plaintiffs' claim that he allegedly incurred in the conduct of his business as a contractor. It is a business debt, not a debt incurred by him for a "personal, family or household purpose." 11 U.S.C. § 101(8). Section 523(d) is, therefore, inapplicable, and Plaintiffs are entitled to judgment on Defendant's counterclaim.

## **CONCLUSION**

Plaintiff having failed to prove that Defendant knowingly, or with gross recklessness as to the truth, made a materially false representation with the intent to deceive Plaintiff and, thus, having failed to satisfy her burden under § 523(a)(2)(A), Defendant is entitled to judgment in his favor on that claim. However, given that the debt at issue is not a consumer debt, Plaintiffs are entitled to judgment on Defendant's counterclaim under § 523(d) for attorney fees and costs. The court will enter a separate judgment in accordance with this Memorandum of Decision and its rulings at trial under Federal Rule of Bankruptcy Procedure 7052 and Federal Rule of Civil Procedure 52(c).

###